**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

U.S. BANKRUPTCY COURT
FILED
CAMDEN, NJ

2019 MAR 18

| | |
|---|---|
| In re:<br><br>LAUREN M. SCHMANEK,<br><br>Debtor. | Case No. 17-30536<br><br>Chapter 7 |
| DOLORES ALIBERT,<br><br>Plaintiff,<br><br>v.<br><br>LAUREN M. SCHMANEK,<br><br>Defendant. | Adv. Pro. No. 18-1005 |

## OPINION

**JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge**

Dolores Alibert, a self-represented plaintiff, filed an adversary proceeding against Lauren M. Schmanek (the "Debtor"), seeking: turnover of property under section 542(a); nondischargeability of debts under sections 523(a)(2) and (6); and to deny the Debtor's discharge under sections 727(c), (d), and (e) of the Bankruptcy Code.[1] Alibert claims Kevlar Builders & Developers, LLC ("Kevlar"), through the Debtor and Kevin Creston, made fraudulent statements to, and obtained money from, Alibert when Creston agreed to make repairs to the Debtor's property at 15 South Manfield Avenue, Margate, New Jersey (the "Property"). The Debtor, also self-represented in this adversary proceeding, filed an answer denying all allegations. A Joint Scheduling Order dated October 17, 2018, notified the parties that the trial would be January 10,

---

[1] The Complaint references several exhibits, but none were attached.

2019. Dkt. No. 34. Only Alibert appeared at trial. The Court struck the Answer due to the Debtor's absence and accepted the well-pleaded factual allegations in the Complaint as true. Alibert also testified at the trial. For the reasons discussed below, the Court concludes that Alibert did not meet her burden of proof to prevail in having her claims ruled nondischargeable under sections 523(a)(2) or (6), or to deny the Debtor's discharge under section 727(a). Moreover, Alibert lacks standing to seek turnover of property under section 542(a) and sections 727(d) and (e) do not apply because they relate to the revocation of discharge, but a discharge has not been granted to date. Therefore, judgment will be entered in favor of the Debtor.

## BACKGROUND

Alibert was the only witness at trial. She certified that the facts asserted in the Complaint were true and testified about some of those allegations. She also attempted to answer the Court's questions. Alibert's testimony often was not credible or conflicted with statements she made earlier in her testimony or facts alleged in the Complaint. Alibert, through the complaint or her testimony at trial, asserted the following material facts.

In early April 2015, Alibert hired Bob Green ("Green") of R.D. Green Engineering to inspect the Property. Green prepared a list of necessary repairs. On April 22, 2015, Alibert entered into a handwritten agreement with Kevlar to remove and replace drywall for $3,000. See Ex. D-5. Alibert issued a $1,500 check, which she said was payable to Creston, but was allegedly cashed by the Debtor. Alibert did not provide a copy of the check and her testimony did not establish the payee of the check, but she did testify that the Debtor signed the check with a reference to Kevlar. Creston began work on the drywall that day but could not complete the project due to mold issues.

At a meeting the next day, Creston proposed to install insulation in a crawlspace and fix a toilet leak for $2,205. Creston also stated he could complete the repairs listed on Green's report.

2

Alibert agreed to all of these repairs and issued several checks to Creston. As with the initial check, Alibert did not produce copies of the checks and her testimony did not establish whether the checks were made out to Creston or Kevlar, but Alibert testified that they were cashed by the Debtor with a reference to Kevlar.

On April 29 Kevlar obtained a construction permit to replace the balcony floors. Kevlar's estimated cost for this work was $4,600, which Alibert paid. Creston began work on the balcony on May 5 by removing the floors.

On May 11, the City of Margate took preliminary steps to red-tag the Property due to a gas leak. That same day, Creston requested additional funds from Alibert for labor and supplies. Creston informed Alibert he needed to order windows, door sets, a dumpster, and cameras. Alibert issued more checks for these items. She also issued additional checks for the gas leak, wood removal, door locks, and plastic wraps for furniture.

The next day the Debtor met Alibert at the Property. This was their first and only meeting. The Debtor claimed she ordered the materials. Alibert never received any invoice or receipt for materials purportedly ordered to match the checks cashed by the Debtor. Alibert testified that during the May 12 meeting, the Debtor told her she was the owner of Kevlar and all tasks required her authorization. This statement was not entirely credible because Alibert testified that she reached agreements with Creston and he began work the same day, which suggested to the Court that Creston contracted with Alibert without conferring with the Debtor or getting the Debtor's permission to enter into those contracts.

The May 12 meeting was also when Alibert learned that the Debtor owned Kevlar. The Debtor requested additional funds at the meeting and told Alibert that Kevlar would complete work in two-weeks. Alibert refused to make any more payments. The same day, the City of Margate

3

red-tagged the Property and ordered everyone off-site, including Alibert, the Debtor, Creston, and Kevlar employees.

Alibert alleges that the Debtor and Creston were at the Property from May 13-17 and that the Debtor directed Creston and Kevlar employees to damage it. Alibert stated she knew the Debtor was at the Property because the Debtor admitted as much. The facts surrounding the admission were hard to understand and not entirely credible. When the Court asked Alibert how she knew Creston and the Debtor were damaging the Property, she responded that the Debtor admitted this fact. Alibert's testimony related to the timing of this alleged admission was difficult to understand, but it may have been after a hearing in state court. Nevertheless, her statements related to these events were not credible because they conflicted her previous testimony that her only meeting with the Debtor was on May 12.

The Complaint alleges that Alibert drove to the Property on May 14 and witnessed Creston's actions from her car, until she left at 7:30 p. m. See Complaint ¶ 18. But her testimony at trial did not comport with the Complaint. Alibert did not mention during the trial that she visited the Property on May 14. Moreover, the Complaint does not allege that the Debtor or Kevlar employees were at the Property as she alleged during trial. If Alibert visited the Property on May 14 and the Debtor was at the Property, the Court questions how she did not see the Debtor, or why this was not mentioned in the Complaint. These contradictions left the Court unable to determine what role, if any, the Debtor had in the alleged damage to the Property between May 13-17.

Alibert also did not provide any evidence that she took steps to protect the Property from further damage. For example, the Complaint states that Alibert stayed in her car watching Creston damage the Property on May 14, but there was no evidence to show that Alibert called the police, confronted Creston, or took any other action to stop him. Further, there was no evidence to suggest

that Alibert took any action the next days to protect the Property – she could have asked a neighbor to keep an eye on the Property or asked the police to drive by the Property to make sure it was vacant.

On several occasions the Court asked Alibert to detail the damages due to the actions at the Property from May 13-17. Alibert's response was different each time. For example, at one point she alleged that the damage included: damage to two bedrooms, ripped floor boards in six bathrooms, ripped sliding glass doors, ripped drywall and cabinets. Later she stated that the damage included damage to five bedrooms and theft of household items, tools, and clothing. Still later, Alibert stated that the damage was to rugs and drapes and that she basically must rebuild the house. The Complaint alleged another account of damages – theft of an iPad, and intentionally shutting off power, water, electric, and gas service.

Following these alleged events, Alibert commenced an action against Kevlar. On October 12, 2016, the Attorney General's Office rendered a judgment in Alibert's favor for $24,980. A year later, the Debtor filed a Chapter 7 petition. The Debtor's Schedules state she was the 100% owner of Kevlar, but it is no longer operational and has no value.

At the end of her testimony, Alibert offered the following documents into evidence: Photographs of the Property, Ex. D-1; Letter to James Gallantino, Ex. D-2; Email Correspondence, Ex. D-3; Creston's Criminal Record, Ex. D-4; Alibert & Kevlar Agreement, Ex. D-5; and Alibert & H. Robert Boney, Jr. Correspondence, Ex. D-6. All the exhibits were admitted, and the record was closed.[2]

---

[2] On February 1, Alibert filed a letter with the Court which attached additional proposed exhibits. The Court did not consider the letter or the additional exhibits because the record was closed at the end of trial.

5

The complaint asks for a judgment of $24,980 and the Adversary Proceeding Cover Sheet states a demand of $85,000. At trial, Alibert stated she seeks a judgment of $490,000.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding under 28 U.S.C. § 157(b)(2) (E), (I), and (J).

## DISCUSSION

### A.    Section 542(a)

Section 542(a) allows a trustee to bring an action for turnover property of the estate. 11 U.S.C. § 542(a). Individual creditors lack direct standing to commence an action to turnover property. See In re Allegheny Health, Educ. and Research Foundation, 233 B.R. 671, 675 (Bankr. W.D. Pa. 1999) (Section 542(a) is "exclusively provided to the trustee or debtor-in-possession."); In re Imagepoint, Inc., 2012 WL 5480631, at *4 (Bankr. E.D. Tenn. 2012) (collecting cases). Because Alibert is not the trustee in this case, she does not have standing and, therefore, cannot prevail on this request for relief.

### B.    Section 523(a)(2)(A)

A principal purpose of the Bankruptcy Code is to provide debtors a fresh start. Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993). To achieve this purpose, the provisions of section 523(a) are "strictly construed against creditors and liberally construed in favor of debtors." In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995). Section 523(a)(2)(A) excepts from discharge any debt for money obtained by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To succeed under section 523(a)(2)(A), Alibert must establish each of the following

6

elements by a preponderance of the evidence: (1) material representation; (2) knowledge of falsity; (3) intent to deceive; (4) justifiable reliance; and (5) damages. In re Howard, 2016 WL 4487631, at *7 (Bankr. D.N.J. 2016); see also Grogan v. Garner, 498 U.S. 279, 291 (1991) (preponderance of the evidence standard applies to all discharge exceptions under section 523(a)). In Howard, this Court explained:

> A material misrepresentation requires more than merely a showing of nonperformance on a promise made to the plaintiff. . . . However, if a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a [material misrepresentation. A] contractor-debtor's fraud or misrepresentation [can be established] in one of two ways: (1) the contractor entered into a contract [with no intent] to comply; or (2) the contractor intentionally misrepresented a material fact or qualification at the time he solicited the plaintiff's business . . . . [P]oor quality workmanship [is not] misrepresentation.

In re Howard, 2016 WL 4487631, at *8 (citations omitted) (internal quotation marks omitted).

Alibert advances two sets of facts in support of her claim under section 523(a)(2)(A): (1) the agreements with Creston, beginning April 22; and (2) the Debtor's demands for additional funds on May 12.

### 1. Agreements with Creston

Alibert seems to argue that Creston and the Debtor were co-conspirators in attempting to defraud Alibert. As discussed above, Alibert initially met Creston in April 2015 and entered into several agreements with him, including to: remove and replace drywall; replace balconies; and complete Green's repair list. She claims that Creston had no intent to complete these tasks, and that he induced her to issue checks, which were cashed by the Debtor. There were no communications between Alibert and the Debtor related to any instances when Alibert provided checks to Creston.

7

To prevail, Alibert must initially show that there was a fraud by Creston. She did not meet her burden of proof related to several of the elements. Alibert did not prove that: Creston made fraudulent representations; Creston knew those representations were false; or that they were made with an intent to deceive. Based on Alibert's own testimony, Creston began work on the drywall, but did not finish because of issues with mold. Creston also obtained permits and began work on the balcony floors and Green's repair list, including the roof, the observatory, and stairs. She testified that Creston did not properly install fiberglass in the observatory. Alibert also testified that she issued additional checks to Creston to obtain a dumpster, door locks, windows, door sets, fix a gas leak, and plastic wraps for furniture. She admitted the dumpster was on-site, but asserted it was not filled. The fact that the dumpster was not filled may have been because Creston stopped work prior to completing the jobs, not because of a fraudulent intent. She also claims Creston changed the locks on the Property but did not provide her the keys.

Creston's work at the Property and steps he took to obtain permits, a dumpster, and new locks do not show that Creston did not intend to comply with the agreements, or that he knowingly misrepresented his qualifications. They also do not show an intent to deceive. Instead, they show that Creston initially intended to perform under the contracts and believed he was able to complete the work. Therefore, Creston's actions do not show fraudulent representations, nor do they rise to the level of fraud. Although some of his work may have been substandard, substandard work is not a misrepresentation, nor a basis to find knowledge of falsity or an intent to deceive. It is merely a basis for breach of contract or perhaps negligence.

This case is similar to <u>Howard</u>, where this Court found that the plaintiffs failed to establish fraud or misrepresentation under section 523(a)(2)(A). The plaintiffs there entered into a contract with the debtor to construct a pool. 2016 WL 4487631, at *1. Several issues arose during

construction, including poor installment of pavers and fence gates, and demands for payments. Id. at *3-5. The debtor performed numerous tasks yet failed to complete the work. Id.

The plaintiffs alleged several misrepresentations, including: the debtor misrepresented his experience, had no intention to complete the pool, demanded payments early, and lacked insurance. Id. at *8. This Court found no evidence of fraud, lack of intent to complete the pool, or misrepresentation to obtain the creditors' business. Id. at *8-10. While the debtor may have provided substandard work or demanded payments prematurely, this "did not rise to the level of fraud." Id. at *9.

Therefore, Alibert did not meet her burden of proof to show there was a fraud.

Even if Creston had committed a fraud related to the agreements, Alibert did not show that the Debtor participated in that alleged fraud. The "participation theory" provides that a "corporate officer can be held personally liable for a tort committed when he or she is sufficiently involved in the commission of the tort." Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303 (2002). See also In re Tinkler, 311 B.R. 869, 874-75 (Bankr. D. Colo. 2004). The participation theory turns on "whether there was actual participation in allegedly tortious conduct rather than on the nature of the tortious conduct." Saltiel, 170 N.J. at 307. Alibert argued that the Debtor was an active participant with Creston. In support of this, Alibert asserted that the Debtor cashed Alibert's checks. But as noted above, it appears that the Debtor cashed the checks as a representative of Kevlar. When the Court asked Alibert what other information she had in support of her allegations that Creston and the Debtor were working together her only response was that they were "like this" as she held two fingers together. Jan. 10 Hearing at 12:12. She did not present facts sufficient to meet her burden to show that the Debtor had knowledge of Creston's allegedly fraudulent representations, that the Debtor was working with Creston to perpetrate a fraud, or to support her

9

allegation that Creston and the Debtor were close. Alibert claimed that the Debtor told her that the Debtor made all decisions for Kevlar, but that was contrary to Alibert's previous statements that she contracted directly with Creston and did not know about the Debtor until the May 12 meeting. For these reasons, Alibert did not meet her burden of proof to show that the Debtor should be liable for fraud related to the agreements between Alibert and Creston.

Alibert also appeared to argue that liability should be imputed to the Debtor because she had an ownership interested in Kevlar. Generally, liability may be imputed to a debtor for an agent's or a partner's tortious acts under agency and partnership law. See, e.g., Strang v. Bradner, 114 U.S. 555, 561 (1885) (applying section 523(a)(2)(A)'s predecessor in a partnership situation); In re Cohn, 54 F.3d 1108, 1119 (3d Cir. 1995). However, courts have declined to extend imputation of liability to corporate officers or members of a limited liability company. See, e.g., In re Nascarella, 492 B.R. 327, 334-35 (Bankr. M.D. Fla. 2013) (creditor could not impute liability on the debtor, a member of a limited liability company); In re Bruton, 2010 WL 2737201, at *5 (Bankr. D.N.M. 2010) (creditor could not impute liability on joint debtor, a member of a limited liability company); In re Villa, 261 F.3d 1148 (11th Cir. 2001) (refusing to extend vicarious liability beyond agency principles discussed in Strang); In re Miller, 276 F.3d 424, 429 (8th Cir. 2002) (declined to extend Strang beyond agency and partnership law).

Even if Alibert had proven a fraud by Creston (which she did not), Alibert did not prove that those acts should be imputed to the Debtor. Alibert testified that Kevlar was a limited liability company. More importantly, Alibert did not prove the Debtor actively participated in wrongful acts in her individual capacity. The only "bad" acts that Alibert asserts against the Debtor related to the agreements were that the Debtor signed checks and that the Debtor and Creston may have been personally close to each other. As discussed above, Alibert did not present facts to show that

the Debtor had knowledge of Creston's alleged fraud, that the Debtor was working with Creston to perpetrate a fraud, or to support her allegation that Creston. Therefore, any alleged fraud by Creston cannot be imputed to the Debtor.

Alternatively, Alibert seemed to argue that the Debtor should be vicariously liable for Creston's actions. Unlike agency and partnership principles where a principal or a partner is vicariously liable for an agent or a partner's tortious acts, members of limited liability companies are not personally liable for wrongful acts committed by the company unless an exception applies. See In re Curriden, 2007 WL 2669431, at *13-14 (Bankr. D.N.J. 2007); Matter of Elsub, Corp., 66 B.R. 172, 181 (Bankr. D.N.J. 1986). Members of a limited liability company are shielded from liability unless they "actively participated in the wrongful acts or cause otherwise exists to pierce the corporate veil." In re Bruton, 2010 WL 2737201, at *5. Alibert did not show facts to meet her burden of proof that the Debtor was an active participant. She submitted the same facts discussed above but did not show how those facts made the Debtor an active participant. Nor was there evidence presented to show the Debtor failed to adhere to corporate formalities, disregard the separate existence of Kevlar as a limited liability company, commingled assets, or met any other element applied to warrant piercing the corporate veil. See, e.g., Pearson v. Component Tech., Corp., 247 F.3d 471, 484-85 (3d Cir. 2000) (identifying eight factors to decide whether sufficient evidence exists to pierce the corporate veil).

For all of these reasons, Alibert did not meet her burden of proof to show that her alleged claim against the Debtor resulting from agreements with Creston should be nondischargeable under section 523(a)(2) of the Bankruptcy Code.

Case 18-01005-JNP    Doc 40    Filed 03/18/19    Entered 03/18/19 13:30:29    Desc Main
Document    Page 12 of 16

### 2. May 12 Meeting

Alibert also alleges the Debtor made fraudulent representations during the May 12 meeting. Alibert testified the Debtor: requested additional funds; told Alibert she had ordered certain materials; and that work would be completed in two weeks. Alibert refused to give the Debtor any money.

Even if the Debtor's statements were misrepresentations and the Debtor knew they were (neither of which did Alibert prove), Alibert still cannot prevail. Alibert did not rely on the Debtor's statements and did not suffer damages for fraud related to the May 12 meeting because she did not give the Debtor any funds. For these reasons, Alibert has not met her burden under section 523(a)(2)(A) related to the May 12 meeting.

### C.    Section 523(a)(6)

Under section 523(a)(6) an individual debtor is not entitled to discharge any debt "for willful and malicious injury by the debtor to . . . the property of another." 11 U.S.C. § 523(a)(6). Alibert bears the burden of proof by preponderance of the evidence. See Grogan v. Garner, 498 U.S. at 291. "An injury is willful and malicious under the Code only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result." In re Conte, 33 F.3d 303, 305 (3d Cir. 1994). "Claims arising under section 523(a)(6) . . . require a showing that a debtor's actions were willful and malicious." In re Suarez, 2010 WL 1382110, at *9 (Bankr. D.N.J. 2010). Courts may grant judgment under section 523(a)(6), where a debtor had authorized or encouraged a third-party to damage property. See, e.g., In re Sintobin, 253 B.R. 826, 830-31 (Bankr. N.D. Ohio 2000).

Alibert alleges the Debtor committed willful and malicious injury because she directed or encouraged Creston and Kevlar employees to damage the Property. Alibert said she learned of the

Debtor's involvement in damaging the Property because the Debtor admitted as much. However, as discussed above, Alibert's testimony related to the timing of this alleged admission was difficult to understand. It may have been after a hearing in state court, but Alibert's only statement about that meeting was that the Debtor had a lot to say in the parking lot. The Court was not persuaded that the alleged statements in the parking lot related to the damage to the Property from May 13-17. Albert's statements lacked credibility because she testified several times that her only meeting with the Debtor was on May 12.

The Complaint states that Alibert drove to the Property on May 14 and witnessed Creston's alleged actions from her car until she left at 7:30 p.m. See Complaint ¶ 18. Alibert did not provide any evidence to show that she took any steps to protect the Property from further damage. The evidence before the Court is that she stayed in her car watching Creston damage the Property instead of calling the police or confronting him or taking any other action to stop him. Although mitigation is more often applied in breach of contract cases, it also applies to tort cases. See In re Jordan, 2008 WL 2782913, *3 (Bankr. M.D. Ala. 2008). See also Restatement (Second) of Torts § 918(2) (1978) (the "Restatement").

Alibert's failure to protect the Property is similar to an illustration from the Restatement: a landowner watches a trespasser damage a fence allowing cattle to escape but fails to take action to protect against damage. In that case the landowner was not entitled to damages. See Restatement § 918 cmt. a, illus. 5. Further, there is no evidence to suggest that Alibert took any action over the next days to protect the Property – she could have asked a neighbor to keep an eye on the Property or asked the police to drive by the Property to make sure it was vacant. As such, the Court cannot conclude that Alibert took any action to mitigate her damages.

Alibert's testimony related to the alleged willful and malicious damage to the Property was inconsistent and not credible. For example, the Complaint alleges that only Creston was at the Property on May 14 but at trial, Alibert testified that the Debtor was also there. The Debtor allegedly made this admission after a hearing before the state court, but Alibert also stated that the Debtor never appeared at hearings. These inconsistencies led the Court to conclude that Alibert did not meet her burden of proof that the Debtor, not Creston, caused damage to the Property.

Even if the Court were inclined to find the Debtor liable for willful and malicious conduct under section 523(a)(6), Alibert did not meet her burden of proof related to damages. On several occasions the Court asked Alibert to detail the damages due to the actions at the Property from May 13-17. Alibert's response was different each time. For example, at one point she alleged that the damage included: damage to two bedrooms, ripped floor boards in six bathrooms, ripped braces for sliding glass doors, ripped drywall and cabinets. Later she stated that the damage was to five bedrooms and included theft of household items, tools, and clothing. At another point, Alibert testified that the damage was to rugs, drapes, and that she basically must re-build the entire house. The Complaint alleged other damages – theft of an iPad, and intentionally shutting off power, water, electric, and gas service.

Alibert submitted photos in support of these allegations. These photos show ripped floorboards in the bedrooms, ripped drywall and ripped dryvit, and water stains on the ceiling and in the garage. Ex. D-1. But several of the photos appear to show that some of the alleged damage may have been work initiated, but not completed, by Creston. See Ex. D-1.

In the Complaint Alibert mentions a judgment (against Kevlar) for $24,980 and the Adversary Proceeding Cover Sheet attached to the Complaint states a demand of $85,000. But at trial Alibert stated that she was seeking damages of almost $500,000. Further, as noted above,

Alibert's testimony related to damages changed each time she discussed them and were contrary to the damages alleged in the Complaint. Moreover, Alibert was not able to quantify her damages - she did not know what her damages were. Therefore, even if Alibert had shown a willful and malicious injury, she did not meet her burden of proof related to damages.

For each of these reasons, Alibert did not reach her burden of proof to show a willful and malicious injury by the Debtor under section 523(a)(6).

### D.    Section 727

Alibert simultaneously seeks to deny and revoke the Debtor's discharge under section 727. Sections 727(d) and (e) relate to revocation of discharge and time to file a complaint to revoke discharge. 11 U.S.C. § 727(d) and (e). Both sections do not apply as the Court has not granted a discharge.

Turning to denial of discharge, section 727(a) directs the Court to grant a discharge unless "the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has . . . concealed, or has permitted to be . . . concealed - property of the debtor within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). The elements for a section 727(a)(2)(A) claim are: "(1) the debtor transferred, removed, or concealed property; (2) the property belonged to the debtor; (3) the act occurred within one year of the filing of the petition; and (4) the debtor intended to hinder, delay, and defraud a creditor. To conceal under this section has been defined as to 'secrete or hide away' or to 'prevent the discovery of or to withhold knowledge of.'" In re Fedele, 2016 WL 889543, at *9 (Bankr. D.N.J. 2016). A creditor has a heavy burden of showing denial of discharge under section 727(a). In re Coven, 2006 WL 2385423, at *13 (Bankr. D.N.J. 2006). It is a heavy burden because denial

of discharge "is an extreme remedy" and "contravenes the policy of affording debtors a fresh start." Id. at *14 (quoting In re Park, 272 B.R. 323, 330 (Bankr. D.N.J. 2001)).

Alibert claims the Debtor has unreported assets in a storage locker in Cape May. She claims the Debtor made false statements about having insurance and no income other than public assistance. Alibert also claims the Debtor has a business called "Scentsy," from which she receives additional income. She also claims the Debtor failed to include her business tax identification number in her schedules and that Kevlar is active and runs advertisements online.

Alibert did not present any evidence in support of these claims. She did not establish ownership of any these assets or show the Debtor had an intent to not disclose these assets in her schedules. Nor did she show the alleged wrongful acts occurred one-year before the petition date. For these reasons, Alibert has not met her burden under section 727(a)(2)(A).

## CONCLUSION

For the foregoing reasons, Alibert did not meet her burden of proof under sections 523(a)(2) or (6) of the Bankruptcy Code, and as such the Court cannot determine that her claim is nondischargeable. Moreover, Alibert did not meet her burden of proof under section 727(a) of the Bankruptcy Code for the Court to determine that the Debtor is not entitled to a discharge. Alibert lacks standing to pursue an action under section 542(a) because those claims can only be pursued by the trustee. Finally, sections 727(d) and (e) do not apply because a discharge has not yet been granted. The Court will enter a corresponding judgment.

Dated: March 18, 2019

JERROLD N. POSLUSNY, JR.
U.S. BANKRUPTCY COURT JUDGE